

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ATLANTA - TED TURNER DRIVE IMMIGRATION COURT**

Respondent Name:

BAKHSHI, KHOSROW

To:

High, Martin Scott
PO Box 33190
Clemson, SC 29633-3190

A-Number:
221-394-565
Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
03/05/2026

☐  Unable to forward - no address provided.

☑  Attached is a copy of the **decision of the Immigration Judge.** This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:

> Board of Immigration Appeals
> Office of the Clerk
> P.O. Box 8530
> Falls Church, VA 22041

☐  Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242B(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252B(c)(3) in deportation proceedings or section 240(b)(5)(c), 8 U.S.C. § 1229a(b)(5)(c) in removal proceedings. If you file a motion to reopen, your motion must be filed with this court:

> Immigration Court

☐  Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available.

☐  Attached is a copy of the decision of the immigration judge relating to a **Credible Fear Review.** This is a final order. No appeal is available.

☐  Other:

Date:

Immigration Judge: SUZETTE SMIKLE 03/05/2026

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : BAKHSHI, KHOSROW | A-Number : 221-394-565

Riders:

Date: 03/05/2026 By: Brittian, Candice, Court Staff

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**ATLANTA – W. PEACHTREE STREET**
**ATLANTA, GEORGIA**

| | |
|---|---|
| Matter of<br><br>**BAKHSHI, KHOSROW**,<br><br>      Respondent | File Number:  **A 221-394-565**<br><br>In Removal Proceedings |

Charges:  Section 212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended ("the Act" or "INA"), in that Respondent is an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General; and

Section 212(a)(7)(A)(i)(I) of the Act, as amended, in that Respondent is an immigrant who, at the time of application for admission, was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

Application(s):  Asylum, pursuant to section 208 of the Act; Withholding of Removal, pursuant to section 241(b)(3) of the Act; Withholding of Removal, under Article 3 of the United Nations Convention Against Torture or Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, pursuant to 8 C.F.R. § 1208.16.

On Behalf of Respondent:
Martin Scott High
PO Box 33190
Clemson, SC 29733-3190

On Behalf of the Department:
Tamika Sheppard, Assistant Chief Counsel
Department of Homeland Security
401 W. Peachtree Street, Suite 2850
Atlanta, Georgia 30308

## DECISION OF THE IMMIGRATION JUDGE

### I. BACKGROUND

Khosrow Bakhshi ("Respondent") is an adult male native and citizen of Afghanistan. He entered the United States at or near San Ysidro, California on or about February 3, 2025. *See* Exh. 1.[1]

On October 17, 2025, the Department of Homeland Security ("DHS" or "the Department") issued Respondent a Form I-862, Notice to Appear ("NTA"), charging him as inadmissible under section 212(a)(6)(A)(i) of the Act. *See id.* A form I-261 adding one factual allegation and charging Respondent inadmissible under section 212(a)(7)(A)(i)(I) was filed by DHS on November 3, 2025. Exh. 2.

At a master calendar hearing on November 3, 2025, Respondent, through counsel, admitted the factual allegations, conceded proper service, and conceded the charges of inadmissibility in the NTA and form I-261. Based on the admissions and concessions, the Court sustained the charges in the NTA and form I-261 and designated Afghanistan as the country of removal. On November 10, 2025, Respondent filed a Form I-589, Application for Asylum and for Withholding of Removal ("asylum application"), with the Court, requesting relief in the form of asylum under section 208 of the Act, withholding of removal under section 241(b)(3) of the Act, and withholding of removal under the United Nations Convention Against Torture ("CAT"). Exh. 3. Respondent filed oral amendments to the asylum application at the merits hearing on February 26, 2026.

On February 26, 2026, Respondent had an individual merits hearing before the Court, during which the Court took evidence and heard arguments regarding his application for relief. At the time of the hearing, Respondent was detained in Folkston, Georgia, and testified via Webex and through a Dari language interpreter. The individual hearing did not conclude until approximately 6:15 in the evening, so the Court reserved its decision on Respondent's application.

### II. EVIDENCE PRESENTED

The evidentiary record consists of documentary exhibits 1 through 5, and the testimony of Respondent. All evidence admitted into the record has been previously identified and labeled by the Court during these proceedings. The entirety of the testimony was taken on February 26, 2026.

The Court has considered all documentary evidence whether it is expressly referred to in this decision or not. The testimony provided in support of Respondent's application, although considered by the Court in its entirety, is not fully repeated herein because it is part of the record. The Court has considered the arguments of both parties and the entire record carefully.

### III. RESPONDENT'S TESTIMONY AND DOCUMENTARY EVIDENCE

Respondent is a 34-year-old, native and citizen of Afghanistan. He entered the United States from Mexico without inspection on or about February 3, 2025. Respondent is unmarried and has

---

[1] The record of these proceedings is maintained in electronic format through the EOIR Courts and Appeals System ("ECAS"). Throughout this decision, the Court will identify specific pages of admitted evidence by citing to the pagination generated when a filing is uploaded to the Electronic Record of Proceedings ("eROP"), which is the official record of these proceedings. 8 C.F.R. §§ 1001.1(cc), 1003.31 (2024).

no children. Respondent did not enter through a port of entry or present himself at a port of entry. Rather, he entered the United States without being admitted or paroled after inspection by an immigration officer, and was not in possession of any valid visa or any other valid document to be admitted into the United States.

Prior to the merits hearing, Respondent's best language was listed as English. At the merits hearing, Respondent stated that he speaks English but would prefer to testify in his native language of Dari. The Court then worked to secure a Dari language interpreter.

Respondent submitted a written declaration in the English language only, but DHS did not object, so the Court admitted it. In his written declaration, Respondent writes that he is from Panjshir, Afghanistan, and the Taliban frequently targets people from that region because they are overwhelmingly opposed to the Taliban. *See* Exh. 4 at 12. Respondent notes that he and his family oppose the Taliban. Respondent claims that people from Panjshir who worked with or on behalf of the United States army were especially targeted.

Respondent writes that he started working for a military contractor in Afghanistan in 2015, which provided support for US Army projects. Respondent claims that he was trained in "Harris military RF-Radios Telecommunication and Network," which the Afghan military needed and used. Respondent claims that he worked as an instructor. He writes that because he was registered in various databases, the Taliban now has all his personal and biographical information.

Respondent claims in his written declaration that two co-workers were killed by the Taliban in 2017. Despite the killings, Respondent continued to work, and claims that in 2019, he began receiving phone calls with threats against him. Even though two of his colleagues had been killed by the Taliban, Respondent writes that he thought the person on the phone was "joking" and he did not take the threats seriously; and he did not pass them on to the police or his office. Exh. 4 at 14. Respondent did not explain in his statement why he thought, after two colleagues were killed, that threats to him would be a "joke."

Respondent goes on to write that the Taliban killed "a lot of innocent people" in the same area where he used to work, and then he received more threats, which he did not take seriously. *Id.* at 15. Respondent failed again to explain why he would not take threats from the Taliban seriously if they had just killed "a lot of innocent people." Respondent writes that he was threatened because he worked for Americans. *Id.*

At the merits hearing, Respondent testified somewhat differently from his written statement. He testified that the part in his written statement about ignoring the continued threats was not accurate and should have been removed. But at the beginning of the hearing, when the Court asked Respondent if he had any changes or edits to make to his application or statement, he made only some changes to his application and no changes to his written statement.

Respondent writes in his written statement that after additional calls from the Talian telling him they knew where he lived and worked, he passed on the threats to his office and management. He did not report the threats to the police. Respondent appears to write, though it is unclear in the statement, that he left the country for some time and then returned, and when he returned, the threats resumed. Respondent then obtained a student visa to Turkey and went to Turkey in or around December 2020. *Id.* at 15. Respondent writes that after he left, his father fell ill, so he

3

returned to Afghanistan. Respondent presented no statement that he was physically harmed by the Taliban during any of his two returns to Afghanistan. Respondent stayed in Afghanistan until July 2021 and then returned to Turkey.

Respondent presented no evidence that at anytime in Afghanistan, he was physically harmed by the Taliban for any reason. Respondent presented no evidence that at anytime in Afghanistan any of his family members was seriously physically harmed by the Taliban. Respondent testified that his father was slapped on two occasions by the Taliban, but not seriously injured.

Respondent writes that the Taliban has searched his house "six or seven times" looking for him. *Id.* at 18.

According to Respondent's testimony, he and his family oppose the Taliban, and his entire family is in danger. He testified that his family is hiding. Respondent also testified that the Taliban wants him to help them use the specialized radios discussed above. Respondent testified that when the Taliban called and threatened him, he was told that he would be killed if he did not "cooperate." He was also asked for military information. Respondent testified that his office became aware of the threats in 2020, even though the threats started in 2019. Respondent then testified, however, that he told his superiors about the threats in 2019, and they recommended that he leave the country for a "short while." After this advice, Respondent went to India from July 2019 until in or around August 2019. Respondent did not explain why he would return to Afghanistan at all if he was being threatened with death by the Taliban and they knew where he lived and worked.

Respondent testified during cross examination that he did not take the first threats in 2019 seriously, but then took the others seriously and reported them to his office.

Respondent testified that because the threats continued and he could not stay in his house, he went to Turkey at the end of 2020 or beginning of 2021. Respondent testified that his father, brother, a sister, and a brother still live in Afghanistan. He has a sister in Germany, who is in touch with the family, but he does not remember what his sister told him about where his family is currently living. Wherever they are, the family has managed to remain unharmed, five years after the Taliban took control of Afghanistan.

Respondent also testified, when questioned by the court, about at least six different times when the Taliban went to his family's house, at different locations, looking for him. Respondent testified that his father was hit or slapped by the Taliban at least twice, but described no serious injuries. His siblings were also pushed and pushed, but not seriously harmed. Although Respondent claims that two of his relatives held high military position, which also makes him a target of the Taliba, Respondent did not list his familial relationship as one of the protected grounds on which he is seeking relief.

Respondent provided corroborating evidence regarding his work in Afghanistan and the fact that the Taliban targeted him, including a certification of appreciation for working for the contractor "Harris." Exh. 4 at 57. Respondent also provided photographs to corroborate his claims.

Respondent's sister provided a statement verifying that the Taliban came looking for Respondent at the family home, but provided no information about what the Taliban said about why they were looking for Respondent, other than accusing Respondent of cooperating with

Americans. Exh. 4 at 81. Respondent's sister's statement does not explain how the Taliban could search the family home multiple times if they are in "hiding."

Respondent's sister writes: "Because of the high-ranking military positions of our uncles, our family is well known to the Taliban and viewed as strongly aligned with the former Afghan government and the United States." *Id.* at 83.

An employee of the Harris Corporation, where Respondent worked while in Afghanistan, also submitted a written declaration. He corroborated that Respondent worked for the company and has expertise in its equipment and radios. This employee also corroborated Respondent's claims of threatening calls. *Id.* at 108.

Respondent also submitted a declaration from another Harris employee, who corroborated the threats and the relocations. *Id.* at 131.

Respondent submitted a written statement from his younger sister, who said that during a search of their home, the Taliban threatened to kill Respondent if he is ever found because he worked with the "infidel Americans." *Id.* at 141.

Respondent provided other corroborative statements.

## IV.    ANALYSIS

### A. Credibility and Corroboration

In all applications for asylum, withholding of removal, and protection under CAT, the Court must make a threshold determination of the noncitizen's credibility. *See Matter of O-D-*, 21 I&N Dec. 1079, 1081 (BIA 1998). In making this determination, "[t]here is no presumption of credibility," and the noncitizen maintains the burden to prove his or her eligibility for relief by credible evidence. *See* INA §§ 208(b)(1)(B), 241(b)(3)(C). Consequently, credibility is of the utmost importance and may be outcome determinative. *See id.* Applications filed after May 11, 2005, are governed by the Real ID Act. *See id.* As Respondent's application was filed after May 11, 2005, the Real ID Act applies to the case.

Under the REAL ID Act, the Court considers the totality of the circumstances and all relevant factors in making a credibility determination, including: (1) the applicant's demeanor, candor, and responsiveness; (2) the inherent plausibility of the applicant's account; (3) the consistency between the applicant's or witness's written and oral statements, the internal inconsistencies of each statement, and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim; (4) the consistency of the applicant's statements with other evidence of record, including the reports of the Department of State on country conditions; and (5) any other relevant factor. INA §§ 208(b)(1)(B)(iii), 241(b)(3)(C); *see also Matter of B-*, 21 I&N Dec. 66, 70 (BIA 1995).

An applicant's own testimony is sufficient to meet his or her burden of proof if it is "believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his alleged fear." *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989); *Matter of Mogharrabi*, 19 I&N Dec. 439, 445–46 (BIA 1987), overruled on other grounds by *Pitcherskaia v. INS*, 188 F.3d 641–48 (9th Cir. 1997); 8 C.F.R. § 1208.13(a), 16(b). "Indications of reliable testimony include

5

consistency on direct examination, consistency with the written application, and the absence of embellishments." *Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1049 (11th Cir. 2009) (*citing Ruiz v. U.S. Atty. Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006)). In contrast, an applicant's testimony is not credible when it is inconsistent, contradictory with current country conditions, or inherently improbable or implausible. *See Matter of S-M-J-*, 21 I&N Dec. 722, 729 (BIA 1997).

In light of any credibility issues, reliable corroboration of Respondent's claims is of increased importance. *See* INA §§ 208(b)(1)(B)(ii), 241(b)(3)(C); *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) ("The weaker an applicant's testimony . . . the greater the need for corroborative evidence." (citing *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998))). When assessing the satisfaction of the applicant's burden of proof in her claim of persecution, courts have recognized the difficulties the applicant may face in obtaining documentary and other corroborative evidence. *See Mogharrabi*, 19 I&N Dec. at 445. As such, "[u]nreasonable demands are not placed on an . . . applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor)." *S-M-J-*, 21 I&N Dec. at 725. However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence must be provided as long as the applicant has the evidence or can reasonably obtain it. *Id.* If such evidence is unavailable, the applicant must explain its unavailability, and the applicant's explanation should be included in the record. *Id.* at 724. Conversely, if an applicant provides no evidence of persecution besides her incredible testimony, an adverse credibility determination is sufficient grounds for the Court to deny the applicant's request for asylum, withholding of removal, and protection under CAT. *See Ruiz*, 440 F.3d at 1254; *Forgue v. U.S. Atty. Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005); *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004); *Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 967 (11th Cir. 2012).

After considering the totality of the circumstances and all relevant factors, the Court finds Respondent **partially credible**. Though the Court finds Respondent's testimony about the work he did in Afghanistan and the threats he received credible, especially with the corroboration he provided, Respondent's testimony about how he came to enter the United States is **not credible.** Respondent testified that he last left Afghanistan in July 2021, and lived and traveled through several countries before eventually finding himself in the United States. Respondent claims that he was first able to obtain a visa to Turkey, where he lived from approximately July 2021 to May 2023. Respondent then traveled to Brazil, where he lived from May 2023 to November 2024. Respondent testified that he then obtained a visa to El Salvador, but was not safe there, so he called a friend living in Brazil for help. Respondent claims that he had no intention or plan to travel to the United States. He claims that his friend in Brazil gave him a number to call, he called the number, gave unknown people his address, and these unknown people picked him up and then forced him to travel from El Salvador to Mexico, and eventually to the United States. Respondent claims that if he or anyone resisted or tried to get away, they would be beaten. Respondent also testified that his father paid $2000 before the alleged "traffickers" released him into the United States.

Although the Court finds credible that there are smugglers and human traffickers in Central America and Mexico bringing people to the United States, and also finds credible that these smugglers and traffickers use threats and violence to control the people they are smuggling to ensure they get paid, the Court does not find credible Respondent's claim that he simply happened

6

upon the United States and had no intention or desire to come here. Respondent is a highly educated man, having studied English and Economics. Respondent has studied business on a student visa in Turkey. Respondent was also an instructor in Afghanistan. It is not believable that Respondent would find himself in El Salvador and then call total strangers to pick him up and take him to some unknown country. Respondent also testified that he tried to make an appointment on the CBP One app, but was unable to do so. It makes little sense that Respondent would try to make an appointment on the CBP One app to come to the United States if Respondent was unaware that the alleged traffickers were taking him to the United States.

The Court concludes that Respondent agreed to have people smuggle him to the United States, but perhaps he got more than he bargained for when men showed up with guns and made him and others follow strict rules to get to their destination. Respondent likely did not know that when he agreed to pay smugglers that they would show up with guns, threats, and beatings. But Respondent's testimony that he did not know where they were taking him and that he had no agreement for them to take him to the United States is not credible. It is not believable that a highly educated man, such as Respondent, would travel from Brazil to El Salvador, and then would blindly agree to have strangers pick him in El Salvador and take him to some unknown destination, at no cost, and that the payment made by his father of $2000, at the end of the trip, was unexpected and made so he could be released from these surprise traffickers and kidnappers.

Further, as explained in more detail below, Respondent's testimony about how he came to enter the United States contradicts his written statement. In his written statement Respondent writes that he was traveling with his girlfriend and together they made their way into the United States. As noted above, relevant factors in making a credibility determination include the consistency between the applicant's or witness's written and oral statements, the internal inconsistencies of each statement, and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim. INA §§ 208(b)(1)(B)(iii), 241(b)(3)(C); *see also Matter of B-*, 21 I&N Dec. 66, 70 (BIA 1995). Here, Respondent provided incredible and inconsistent statements about he came to enter the United States.

The Court also finds certain portions of Respondent's testimony and statements incredible or inconsistent. Respondent wrote in his written statements that he did not take the first two rounds of threats from the Taliban seriously and did not report them, but changed his claim during his testimony. Respondent testified that he only failed to take the first threat seriously, but took all others seriously and reported them. It also makes little sense that Respondent would take threats from the Taliban as "jokes," when two of his colleagues were killed.

Therefore, the Court finds Respondent only partially credible and enters an adverse credibility finding. The Court is extremely concerned about the incredible, inconsistent, and contradictory statements and testimony provided by Respondent. An adverse credibility determination is sufficient grounds for the Court to deny the applicant's request for asylum, withholding of removal, and protection under CAT. *See Ruiz*, 440 F.3d at 1254*; Forgue v. U.S. Atty. Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005); *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004); *Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 967 (11th Cir. 2012). Although the Court finds portions of Respondent's testimony **not credible,** the Court will not deny Respondent's application solely based on this finding, but will instead evaluate his claims on the merits. Though Respondent was not entirely truthful, he provided multiple documents and statements corroborating key aspects

7

of his claims of persecution. And DHs has not disputed the authenticity of those statements or documents. The Court has also considered the evidence in the record regarding the brutal conditions imposed by the Taliban.

### B. Asylum under Section 208 of the Act

An asylum applicant must prove by clear and convincing evidence that their asylum application was timely filed. 8 C.F.R. § 1208.4(a)(2)(i)(A)–(B). Pursuant to INA § 208(a)(2)(B), an applicant must file their asylum application within one year of the date of their arrival in the United States or April 1, 1997, whichever is later. *See also* 8 C.F.R. § 1208.4(a)(2)(ii).[2]

In addition, the applicant in an asylum adjudication bears the burden of establishing statutory eligibility by showing that they meet the definition of a refugee found in section 101(a)(42)(A) of the Act. INA § 208(b)(1)(B)(i); 8 C.F.R. § 1208.13(a). An asylum applicant may demonstrate that he or she is a refugee in either of two ways. 8 C.F.R. § 1208.13(b). First, they may show that they have suffered past persecution on account of their race, religion, nationality, membership in a particular social group ("PSG"), or political opinion. 8 C.F.R. § 1208.13(b)(1). Second, they may show that they have a well-founded fear of future persecution on account of a protected ground through credible testimony that they subjectively fear persecution, and evidence that this fear is objectively reasonable. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430–31 (1987); *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir. 2001); 8 C.F.R. § 1208.13(b)(2).

In order to demonstrate past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a PSG, or political opinion, an applicant must show: (1) that the harm rises to the level of persecution; (2) the required nexus exists between the persecution and at least one of the five protected grounds listed in the Act's refugee definition; and (3) that the past or future harm or suffering was or will be inflicted either by a government agent or by persons or an organization that the government was unable or unwilling to control. INA § 101(a)(42)(A); *Matter of Acosta*, 19 I&N Dec. 211, 222–23 (BIA 1985), *modified on other grounds by Mogharrabi*, 19 I&N Dec. at 446–47. In addition, the applicant's fear of future persecution must be country-wide. *See Matter of C-A-L-*, 21 I&N Dec. 754, 757 (BIA 1997); *Matter of R-*, 20 I&N Dec. 621, 625–26 (BIA 1992); *Acosta*, 19 I&N Dec. at 235.

If an applicant demonstrates they have suffered past persecution, a rebuttable presumption of a well-founded fear of future persecution will be triggered. 8 C.F.R. § 1208.13(b)(1); *see also Matter of Chen*, 20 I&N Dec. 16, 18 (BIA 1989). This presumption can be rebutted if DHS establishes by a preponderance of the evidence that there has been a "fundamental change in circumstances," which results in the applicant no longer having a well-founded fear of future persecution upon being returned to their home country, or that the applicant could avoid future persecution by internal relocation in their home country, and it would be reasonable to expect them to do so. 8 C.F.R. § 1208.13(b)(1)(i).

Finally, asylum is a discretionary form of relief. *Cardoza-Fonseca*, 480 U.S. at 443; *Mogharrabi*, 19 I&N Dec. at 447. Therefore, once an applicant has established statutory eligibility

---

[2] The Department did not dispute that Respondent's asylum application was timely filed.

for asylum, they must also demonstrate that he or she warrants a favorable exercise of discretion. *Matter of H-*, 21 I&N Dec. 337, 347 (BIA 1996).

### 1. Circumvention of Lawful Pathways[3]

Pursuant to the CLP rule, an applicant is presumed ineligible for asylum if that applicant: (1) does not have documents sufficient for lawful admission under § 212(a)(7) of the Act; (2) enters the United States from Mexico at the southwest land border or adjacent coastal borders between **May 11, 2023, and May 11, 2025**; and (3) has travelled through certain countries other than their country of citizenship, nationality, or, if stateless, last habitual residence that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees. 8 C.F.R. § 1208.33(a)(1).

Respondent entered the United States from Mexico on or about February 3, 2025. *See* Exh. 1. He did not have documents sufficient for lawful admission under § 212(a)(7) of the Act. *See* Exh. 1. Additionally, Respondent traveled through several countries other than his country of citizenship, some of which, such as Brazil, El Salvador, Guatemala, and Mexico, are parties to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees. As such, Respondent is subject to the CLP rule. Accordingly, the Court finds that the Department has met its burden under 8 C.F.R. § 1208.33(a)(1), and therefore, Respondent is presumed ineligible for asylum.

The rebuttable presumption of asylum ineligibility does not apply if: (1) the alien was at the time of entry an unaccompanied alien child;[4] or (2) the alien, or a member of the alien's family[5] with whom the alien is traveling: (A) was authorized to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (B) presented at a port of entry pursuant to a pre-scheduled time, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or; or (C) sought asylum in a country through which the applicant travelled and received a final decision denying that application. *See* 8 C.F.R. § 1208.33(a)(2).

Here, Respondent claims that he was "trafficked" to the United States against his will, though the Court does not find this portion of his testimony credible, as discussed above. Respondent also testified that he tried to get an appointment on the CBP One app, but could not, and by the time he crossed into the United States, in February 2025, the CBP One app was no longer operational. The Court acknowledges that as of January 20, 2025, the CBP One app was no longer operational. See https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app (U.S. Customs and Border Patrol Website noting that "U.S. Customs and Border Protection (CBP) announced removal of the scheduling functionality within the CBP One mobile

---

[3] The Circumvention of Lawful Pathways rule, 88 Fed. Reg. 31314 (May 16, 2023) (Final Rule) (effective May 11, 2023), is the subject of active litigation. The rule was previously vacated by a federal district court. *See E. Bay Sanctuary Covenant v. Biden*, No. 18-CV-06810-JST, 2023 WL 4943384 (N.D. Cal. Aug. 1, 2023). In August of 2023, the decision was stayed pending review, and in February 2024, the appeal was placed in abeyance pending settlement negotiations. *See E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130, 1131 (9th Cir. 2024). Thus, the rule is currently in effect.

[4] As defined by 6 U.S.C. § 279(g)(2).

[5] As defined described in 8 C.F.R. § 208.30(c).

application, effective Jan. 20, 2025, at noon EST."). The website also noted that all pending appointments were cancelled. Respondent might have been able to argue that the app being taken down prevented him from making an appointment, but again, as noted above, Respondent did not present himself at a port of entry to make that argument, which could have triggered an exception under the CLP. Despite the app being down, the rule was still in effect when Respondent was traveling from El Salvador to the United States, and when he entered the United States; and even if it was not possible to access or use the CBP One app, Respondent still needed to present himself *at a port of entry* and explain the serious obstacle that prevented him from making an appointment. He failed to do so. Without presenting himself at a port of entry, Respondent has not shown that he is not subject to the CLP rule.

To rebut the presumption of asylum ineligibility, an applicant must demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including that they or their family member: (1) faced an acute medical condition; (2) faced imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of severe form of trafficking in persons" pursuant to 8 C.F.R. § 214.201. *See* 8 C.F.R. § 1208.33(a)(3). An applicant who demonstrates any of these compelling circumstances shall necessarily rebut the presumption and be eligible to seek asylum. 8 C.F.R. § 1208.33(a)(3).

In addition, the presumption of asylum ineligibility is also rebutted where: (1) a principal applicant is eligible for withholding of removal; (2) the principal applicant would be eligible for asylum but for the presumption under 8 C.F.R. § 1208.33(a)(1); and (3) an accompanying spouse or child under section 208(a)(3)(B) of the Act, or a spouse or child following to join under that section, does not independently qualify for asylum or other protection from removal. 8 C.F.R. § 1208.33(c).

Here, Respondent asserts that he has overcome the presumption of ineligibility because he faced imminent and extreme threat to his life or safety, and he was also a victim of trafficking. First, although Respondent argues that he was trafficked, the Court finds that he does not meet the definition of a "victim of severe form of trafficking in persons" pursuant to 8 C.F.R. § 214.201. A "[v]ictim of a severe form of trafficking in persons (victim) means a noncitizen who is or has been subjected to a severe form of trafficking in persons." *Id.* And "severe form of trafficking in persons means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." *Id.* Respondent has not presented any evidence to show that he meets the definitions above.

Second, with regard to Respondent's claim that he faced imminent and extreme threat to his life or safety, the Court finds Respondent's assertions incredible and uncorroborated. Respondent would like the Court to find that because he hired smugglers to transport him to the United States, and because they had guns and strict rules, and beat up people who did not follow those rules, he faced imminent threat. But Respondent himself testified that his father paid $2000 for him to be released into the United States. If Respondent's testimony is taken as true, the smugglers had strict rules for the people they were smuggling because that is how they get paid. Thus, even though the

10

Court finds credible the testimony of threats and beatings by smugglers, the Court finds that Respondent did not present sufficient evidence that he face imminent and extreme threat to his life or safety. His father paid the $2000 fee and Respondent was delivered to the place where he wanted to go, the United States. Respondent's testimony otherwise is not believable. Respondent presented no statements from his friend in Brazil, from his father, or from any family member corroborating his claim that he was trafficked or smuggled into the United States against his will. Respondent also claims he communicated with his father via cell phone, but presented no cell phone messages to show the nature of those communications. Respondent also presented no evidence of how his father, in February 2025, could receive text messages and send money to Mexico, yet he is in hiding from the Taliban and currently unreachable by Respondent.

Respondent's testimony is also inconsistent with his written statement. In his testimony, Respondent claimed that the alleged traffickers forced him into the United States at gunpoint, under threat of harm. In his written statement, however, Respondent writes that he was in Mexico for *two months waiting* for a CBP One appointment because he and his girlfriend did not want to cross the border illegally. Exh. 4 at 19. In his testimony, Respondent mentioned *nothing* about meeting up with and traveling with his girlfriend. And no statement from his girlfriend was provided to corroborate his claims. Further, if Respondent was being trafficked by traffickers under threat of harm, against his will, to a country he was not intending to go to, why would he "wait" in Mexico for *two months* for a CBP One appointment. Respondent writes in his statement that when the CBP One app closed, they (meaning he and his girlfriend) did not see any option to come to the US legally. The fact that Respondent was trying to get an appointment on the app shows that Respondent was aware of the requirement to at least present himself at a port of entry, and was under no imminent threat of harm. Thus, even if he could not get an appointment, Respondent could still present himself at a port of entry and seek asylum. Most importantly, Respondent said nothing in his written statement about being forced to cross the border under imminent threat to his life or safety by human traffickers. Respondent writes, "Out of no choice *we got ourselves* to Tijuana, Mexico with thousands of problems and hope of living a normal life without fear, so we entered the U.S. and surrendered ourselves to CBP officer at the border and asked for asylum." Exh. 4 at 19 (emphasis added). Respondent's written statement therefore contradicts his testimony about how he came to enter the United States.

The Court has found no legal authority invalidating the requirements of the CLP rule to at least present oneself to a port of entry during the relevant time period or submit an adequate reason why that was not possible. As such, the Court finds Respondent is ineligible for asylum under the CLP rule and has not overcome the presumption of ineligibility. His application for asylum is therefore **DENIED** on this ground.

### 2. Past Persecution

Even though the Court finds Respondent ineligible for asylum pursuant to the CLP rule, the Court will still evaluate Respondent's claim on the merits, in the alternative. In order to demonstrate past persecution, an asylum applicant must show that his or her harm rises to the level of persecution. *Acosta*, 19 I&N Dec. at 222–23. The term "persecution" means harm or suffering that is inflicted upon an individual in order to punish him or her for possessing a belief or characteristic a persecutor seeks to overcome. *Acosta*, 19 I&N Dec. at 222. Persecution is defined as either "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." *Id.* Persecution is an extreme concept and does not

11

encompass all treatment that society regards as unfair, unjust, or even unlawful. *See Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000); *Matter of V-T-S-*, 21 I&N Dec. 792, 798 (BIA 1997).

Respondent claims past persecution and a well founded fear of future persecution based on three protected grounds: race, nationality, political opinion, and membership in a particular social group. His proposed PSG is "Panjshiri Tajik Afghan who worked with and for the United States miliary during the Afghan war."

Upon review of the record in sum, the Court finds that Respondent failed to establish that he suffered past persecution, regardless of the protected grounds. *See Acosta*, 19 I&N Dec. at 223. Respondent was threatened on multiple occasions but never harmed. Respondent left and returned to his country, after receiving threats, and still remained unharmed. Respondent claims that the Taliban will find him and kill or torture him if he returns to Afghanistan, but Respondent did leave and return to Afghanistan, and the Taliban did not find and torture him. As to the phone calls, mere harassment, threats, or menacing phone calls do not amount to persecution. *See Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1237–38 (11th Cir. 2006); *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005); *see also Martinez v. US Atty Gen.*, 992 F.3d 1283 (11th Cir. 2021)).

The Court recognizes that threats from the Taliban, which now controls Afghanistan, could equate to past persecution because of the Taliban's history of violence and torture. "A credible death threat by a person who has the immediate ability to act on it constitutes persecution regardless of whether the threat is successfully carried out." *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1333–34 (11th Cir. 2010); *see also Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232–34 (11th Cir. 2007) (finding past persecution when persecutors threatened the applicant, shot at him, and attempted to kidnap his family members). In addition, the Court "may consider a threatening act against another as evidence that the [applicant] suffered persecution where that act concomitantly threatens the petitioner." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1009 n.7 (11th Cir. 2008). The Court cannot classify the threats in this case as severe harm or suffering, however. Indeed, even though he tried to change his claims during his testimony, Respondent wrote in his written statement that he did not take the initial threats seriously. He was also never harmed after he ignored the initial threats, even though he claims the Taliban knew where he lived and worked. Thus, there is no past persecution. *See Ruiz v. U.S. Atty. Gen.*, 440 F.3d 1247, 1258 (11th Cir. 2008); *Sanchez v. U.S. Atty. Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)("[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation*."); see, e.g., Kazemzadeh v. U.S. Atty. Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009) (stating that minor physical abuse and brief detentions do not amount to persecution); *Djonda v. U.S. Atty. Gen.*, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008) (noting an applicant who was detained and beaten for thirty-six hours, hospitalized for two days, and threatened with re-arrest did not demonstrate past persecution); *Matter of M-B-A-*, 23 I&N Dec. 474, 488 (BIA 2002) ("sporadic light beatings with fists and sticks, and other acts fairly characterized as government security brutality do not constitute torture") (citing *Matter of J-E-*, 23 I&N Dec. 291, 302 (BIA 2002)); *Eduard v. Ashcroft*, 379 F.3d 182, 188 (55th Cir. 2004)(establishing conduct must be extreme in order to constitute persecution; the concept does not encompass all treatment society regards as unfair or unlawful); *Martinez v. U.S. Attorney* General, 992 F.3d 1283 (11th Cir. 2021) (upheld decision where no past persecution was found when the applicant was beaten by people who appeared to officers; threatened for his work writing in a magazine critical of Cuba's tax policies by a well-known group of government informants; seized, detained overnight, and threatened by

12

Cuban officials; fired from three jobs as a waiter after government officials threatened the business owners; arrested and detained for three days and then kicked out of a different town due to his political problems in his hometown; and forced to hand over his laptop and cell phone to the Cuban government and stopped from leaving the country).

Respondent also failed to show that even if the threats were deemed persecution, that those threats were a result of his race, nationality, or political opinion. Respondent presented no evidence that he was specifically targeted by the Taliban because of his Tajik race or because he is a national of Afghanistan. Evidence that the Taliban fights against different kinds of people in Afghanistan, including people of Respondent's race, does not alone show that a central reason for the threats *to Respondent* was due to his race. Respondent presented insufficient evidence that he faced harm because of his race or nationality. Indeed, Respondent testified that his family members share the same race and nationality, yet when they encountered the Taliban, on multiple occasions when the Taliban was looking for Respondent, they were not killed or tortured because of their race or nationality. If Respondent's race or nationality was a central reason for any past threats or future persecution, then Respondent's family members would not have been spared. In *Matter of A-E-M-*, 21 I&N Dec. 1157, 1160 (BIA 1998), the BIA held that the applicant's objective fear is undercut when his family remains in the native country unharmed or by the passage of time.

Respondent also failed to show that the Taliban targeted him because of any expressed or imputed political opinion of being opposed to Taliban rule. Respondent testified that he publicly expressed no views or opinions about the Taliban. Further, using Respondent's logic, Respondent's family members, who supported and protected Respondent who worked for the Americans, and whose members were a part of the Afghan military, would also be considered "opposing the Taliban," yet they were not seriously harmed or killed when they were face to face with the Taliban, on more than one occasion, according to Respondent's testimony and the statements from family members. In sum, Respondent has not established that even if he experienced past persecution, that persecution was due to his political opinion.

We are left with Respondent's proposed PSG: "Panjshiri Tajik Afghan who worked with and for the United States miliary during the Afghan war." The Court acknowledges that Respondent was threatened that if he did not stop working for the Americans, even if indirectly, he would be killed. But Respondent's testimony was internally inconsistent. On the one hand, Respondent testified that he was targeted because of his alignment with the United States through his work helping to train the Afghan army on behalf of the United States. But Respondent focused much of his testimony and written statement on the fact that the Taliban wanted to find him, not to kill him, *but for him to help train them on specialized radios*. Thus, it appears that even though the Taliban sought out Respondent, which the Court does find credible and corroborated, Respondent's own testimony is that he was primarily targeted because of his expertise, not because of his race, nationality, political, or membership in a particular social group. Additionally, based on Respondent's testimony, the fact that he worked for United States, indirectly, might be incidental or tangential to the real reason he was targeted  - - for him to share his expertise and help the Taliban with specialized radios.

13

### 3. Well-Founded Fear of Future Persecution

Even though the Court finds that Respondent did not suffer past persecution, he may still qualify for asylum if he demonstrates that he has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(2)(i). To do so, he must demonstrate that (1) he fears persecution on account of a protected ground and (2) there is a reasonable possibility that he will suffer persecution if removed to his native country. *See id.* The applicant must also prove that his fear of persecution is "subjectively genuine and objectively reasonable." *Matter of J-H-S-*, 24 I&N Dec. 196, 198 (BIA 2007) (citing *Cardoza-Fonseca*, 480 U.S. 421). The subjective component can be satisfied by the applicant's credible testimony regarding his fear, while the objective component can be established when the applicant demonstrates past persecution or a "good reason to fear future persecution." *Al Najjar*, 257 F.3d at 1289 (citation omitted).

Respondent must show either that he would be singled out for persecution upon returning to his country of nationality or that, within that country, there is a pattern or practice of persecution on account of a protected ground of those similarly-situated to the applicant himself, and that he identifies with the group such that his fear is reasonable. 8 C.F.R. § 1208.13(b)(2)(iii). Additionally, Respondent must also show that he could not avoid future persecution by relocating to another part of the country of removal or that, under all of the circumstances, it would be unreasonable to expect him to relocate. 8 C.F.R. § 1208.16(b)(2).

In this case, the Court finds Respondent's subjective fear reasonable. The Court also finds that his fear of the Taliban is objectively reasonable, based on being specifically targeted and because of the Taliban's history of violence, oppression, and torture. But Respondent still has to show that his feared persecution is based on a protected ground. The only viable protected ground, as discussed above, is Respondent's proposed PSG. The applicant must establish that the past persecution or well-founded fear of persecution was or will be "on account of [his] race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A). Moreover, under the REAL ID Act, an asylum applicant must show that a protected ground "was or will be at least one central reason" for the persecution. INA § 208(b)(l)(B)(i); *see Matter of J-B-N- & S-M-,* 24 I&N Dec. 208, 212 (BIA 2007). The protected ground is a persecutor's central motivation if it is not "incidental, tangential, superficial, or subordinate to another reason for harm." *J-B-N- & S-M-,* 24 I&N Dec. at 214.

An applicant claiming persecution on account of his membership in a particular social group bears the burden of demonstrating the existence of a cognizable particular social group, his membership in that particular social group, and a risk of persecution on account of his membership in the specified particular social group. *Matter of W-G-R-*, 26 I&N Dec. 208, 223 (BIA 2014) (referencing *Ayala v. Holder*, 640 F.3d 1095, 1097-98 (9th Cir. 2011)). The BIA has clarified the term "membership in a particular social group," explaining that applicants for asylum under this category must establish that the group is (1) composed of members who share a common, immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question. *Matter of M-E-V-G-*, 26 I&N Dec. 227, 237 (BIA 2014); *Matter of W-G-R-*, 26 I&N at 209-18; *Ramos v. Holder*, 589 F 3d 426, 428 (7th Cir. 2009).

"The essence of the 'particularity' requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct [sic] that the group would be recognized, in the society in question, as a discrete class of persons." *Matter of S-E-G-*, 24 I&N Dec. 579, 584

14

(BIA 2008). In deciding whether a group is sufficiently particular, "[i]t is critical that the terms used to describe the group have commonly accepted definitions in the society of which the group is a part." *M-E-V-G-*, 26 I&N Dec. at 239. In addition, [t]he group must be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *Id.*

"Social distinction" does not mean "'ocular' visibility," but instead refers to "social recognition." *M-E-V-G-*, 26 I&N Dec. at 240. To be socially distinct, a group must be perceived by the society in question as a group. *Id.* Thus, in examining whether a group is socially distinct, the Court should consider "the extent to which members of the purported group would be recognizable to others" in the country. *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006), *clarified by M-E-V-G-*, 26 I&N Dec. 227, *and W-G-R-*, 26 I&N Dec. 208.

The Court finds Respondent's proposed PSG to be cognizable. Based on the evidence submitted, it is socially distinct in the society in question and is sufficiently particularized.

Respondent presented reports and articles about the Taliban targeting people who worked for the United States military because they are viewed as being opposed to the Taliban. Respondent's sister's statement says, however, that the entire family is known to be opposed to the Taliban, especially because of the two uncles who were in the military. But despite the entire family being known to be against the Taliban, the Taliban has visited the family multiple times and did not seriously harm or kill any of them. Further, family members have remained in Afghanistan five years after the Taliban took over and they have not been seriously harmed or killed.

Nonetheless, it appears that the Taliban's focus is on Respondent for his specific work with the military contractor. Respondent has also sufficiently corroborated his claims of direct and personalized threats, with the multiple statements from family and colleagues. Respondent has also credibly shown that the Taliban has gone looking for him and is specifically searching for him. From Respondent's testimony, it is not entirely clear if they are searching for him because they want to kill him because of his association with Americans, or because they want him to help them with the radios. In either scenario, Respondent is unlikely to cooperate with the Taliban based on his testimony, which means he has a well-founded fear of being harmed, tortured, or killed. Additionally, even if Respondent's cooperation is the primary reason the Taliban is seeking out Respondent, the Court finds that Respondent's association and work on behalf of Americans is also a central reason.

In sum, if the CLP rule did not apply, and even though the Court finds that Respondent was not entirely truthful to the Court, the Court finds that Respondent submitted sufficient evidence of a well-founded fear of future persecution based on a cognizable PSG.

### C. Withholding of Removal under Section 241(b)(3) of the Act

In contrast to asylum, withholding of removal under the Act confers only the right not to be deported to a particular country, rather than the right to remain in the United States. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). Under INA § 241(b)(3)(A), an Immigration Judge is prevented from removing a noncitizen to a country where there is a clear probability that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *See also INS v. Stevic*, 467 U.S. 407, 430 (1984). The applicant bears the burden of demonstrating that it is "more likely

15

than not" that he will be persecuted on account of a protected ground in the country from which he seeks withholding of removal.(*See* INA § 241(b)(3)(C); *Stevic*, 467 U.S. at 424; *Sepulveda*, 401 F.3d at 1232. Because the "clear probability" standard for withholding of removal is higher than the "well-founded fear" standard for asylum, if an applicant is unable to establish a well-founded fear of persecution, they are "'generally precluded from qualifying for either asylum or withholding of [removal].'" *Sepulveda*, 401 F.3d at 1232–33 citing *Mazariegos*, 241 F.3d at 1324–25 n.2; *see also Cardoza-Fonseca*, 480 U.S. at 438–4.

As explained *supra*, the Court found Respondent is ineligible for asylum because of the CLP rule, but the Court also found that even though he has not demonstrated that he suffered past persecution, he has a well-founded fear of persecution on account of a protected ground. Withholding of removal under the INA holds a higher standard than the standard for asylum. Respondent must show a clear probability of persecution based on a protected ground.

Because of this Court's adverse credibility finding, it can deny all the relief Respondent is seeking. *See Tang v. U.S. Att'y Gen.,* 578 F.3d 1270, 1276–77 (citing *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287, 1288 n.4 (11th Cir. 2005)). Nonetheless, in this case, despite the Court's serious concerns about Respondent's credibility, the Court finds that Respondent has met the higher standard of withholding of removal based on his testimony and the corroborative documents in the record. The Court has also considered the significant evidence of the Taliban's brutality against individuals who supported or worked for the United States military before the Taliban took power. The Taliban has personally targeted Respondent, has directly threatened him, and has told his family that they will kill him when he is found. They are also actively looking for him. DHS did not dispute this evidence The Court further finds that the Taliban is targeting Respondent because of a cognizable PSG. The Court also finds that the Taliban controls all of Afghanistan, and even though Respondent's family has remained safe, it is not reasonable to expect Respondent to escape the Taliban anywhere in Afghanistan. Based on this evidence, the Court finds that it must **GRANT** withholding of removal under the Act.

### D. Relief under the Convention Against Torture.

An applicant for withholding of removal under CAT bears the burden of proving that it is "more likely than not" that he will be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). "Torture" is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 1208.18(a)(1). "Torture" is an "extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Additionally, to constitute "torture," the "act must be directed against a person in the offender's custody or physical control." 8 C.F.R. § 1208.18(a)(6). Further, the pain or suffering must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official" requires that the public official, "prior to the activity constituting torture, have awareness of such activity and thereafter breach her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see also Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242–43 (11th Cir. 2004); *S-V-*, 22 I&N Dec. at 1316–17. This standard differs substantially from the standard for government action in asylum and withholding under the Act.

16

In assessing whether an applicant has satisfied the burden of proof, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). If an applicant is unable to establish a well-founded fear of persecution, the noncitizen necessarily fails to establish that it is more likely than not that he or she will be tortured based on a protected factor. *See Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1201 (11th Cir. 2009); *Al Najjar*, 257 F.3d at 1303–04; 3 *Forgue*, 401 F.3d at 1288 n.4.

In this case, the Court has granted Respondent's request for withholding of removal under the INA. The Court therefore need not evaluate Respondent's request for withholding of removal under the CAT. *See INS v. Bagamasbad*, 429 U.S. 24, 25, 97 S. Ct. 200, 50 L. Ed. 2d 190 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."). Nonetheless, the Court notes, in the alternative, that Respondent has demonstrated that it is "more likely than not" that he will be tortured if removed to the proposed country of removal by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. The Taliban, which now controls Afghanistan, is directly seeking out Respondent. They have told his family members that he will be killed if he is ever found. They have searched his home multiple times. Based on the threats and the credible statements from family and co-workers, which DHS has not disputed, the Court finds that he is also entitled to relief under the CAT, in the alternative.

Accordingly, the Court enters the following Orders:

## ORDERS

**IT IS HEREBY ORDERED THAT** Respondent's application for asylum under section 208 of the Act is **DENIED**.

**IT IS HEREBY ORDERED THAT** Respondent's application for withholding of removal under section 241(b)(3) of the Act is **GRANTED**.

**IT IS HEREBY ORDERED THAT** Respondent's application for relief under the Convention Against Torture, pursuant to 8 C.F.R. § 1208.16 is **GRANTED, in the alternative.**

**IT IS HEREBY FURTHER ORDERED THAT** Respondent shall be **REMOVED** to **Afghanistan** from the United States pursuant to the charges in the Notice to Appear and the form I-261.

**IT IS FURTHER ORDERED THAT** Respondent's Removal to Afghanistan shall be **WITHHELD** under section 241(b)(3) of the Act and pursuant to 8 C.F.R. § 1208.16.

Suzette Smikle
United States Immigration Judge
Atlanta, Georgia

17

*NOTICE OF THE RIGHT TO APPEAL: You are hereby notified that both parties have the right to appeal the Immigration Judge's decision in this case to the Board of Immigration Appeals ("Board"). 8 C.F.R. § 1003.38(a). A Notice of Appeal (Form EOIR-26) must be submitted to the Board within 30 calendar days from the issuance or mailing of this decision. 8 C.F.R. § 1003.38(b). If the final date for filing falls on a Saturday, Sunday, or legal holiday, the filing date is extended to the next business day. Id. If no appeal has been taken within the time allotted to appeal, the Immigration Judge's decision becomes final. Id. By failing to timely file an appeal, a party irrevocably relinquishes the opportunity to obtain review of the Immigration Judge's decision and challenge the ruling.*

*Failure to Depart Warnings: The Immigration Court has ordered you removed from the United States. If you willfully fail or refuse to apply for the required travel documents to depart the United States, to present yourself for removal as instructed, to depart the United States as instructed, or to take any action, or conspire to take any action, to prevent or hamper your departure, you will be subject to a civil monetary penalty per day you are in violation. INA §§ 240(c)(5), 274D(a); 8 C.F.R. §§ 240.83(b)(14) and 1240.13(d). Further, any Respondent that has been denied admission to, removed from, or has departed the United States while an order of exclusion, deportation, or removal is outstanding and thereafter enters, attempts to enter, or is at any time found in the United States shall be fined or imprisoned not more than two years, or both. 8 U.S.C. § 1326(a).*

18

**Order of the Immigration Judge**

Immigration Judge: SUZETTE SMIKLE 03/05/2026

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : | A-Number :

Riders:

Date: 03/05/2026 By: Brittian, Candice, Court Staff